Brad Floyd on behalf of Miller Farms, who is Plaintiff and Appellant in this matter. The main question that is facing the Court on this appeal is whether or not the oral contract between the parties in this case was a primarily goods contract or services contract as defined by the California UCC. And under the definition of goods that is provided by that code, the materials that were used in this project easily fall into that. Asphalt mix, which is gravel and oil, the concrete, the limestone blocks, etc. were goods. And so then going with the main case that is on this, the California Case Film Service, that case says that in determining a mixed goods versus services contract, the test is that is the essence of the contract predominantly goods or is the essence of the contract predominantly services? If it's predominantly goods, then it's a goods contract and the four-year statute applies. If it's predominantly services, then the two-year statute applies. And as the Court knows in this case, if it's determined it's a services contract, then based on statute of limitations, then Miller Farms doesn't have a case on the oral contract because more than two years had transpired before the action was filed. Could we just understand, the written contract, was there a dispute as to whether that was goods or services? That was never disputed because the oral contract was 99.9 percent of the money that was owed. And so all the focus has been on the oral contract plus the written contract. I guess I didn't quite frame it. I'm sorry. Was that ever at issue? I mean, is it agreed between the parties that the written contract, the original written contract, was mixed but predominantly for goods or predominantly for services? Or it just wasn't litigated? It wasn't litigated because it's a written contract, which gives you the four-year statute, and so we didn't have a statutory problem with that. And so looking at what is predominantly goods versus services, we cited a number of cases in our brief and provided information under declaration from the vice president of Miller Farms that, for instance, the asphalt, the materials or goods of the asphalt cost three times as much as the labor in laying the asphalt. For some reason, the district court judge got, and I'm not sure there was no evidence on this, but in her decision indicated that there would also be costs for hauling, for equipment rental, and that kind of stuff. Well, there was no evidence before her about hauling costs. There was no evidence before her of equipment rental. This equipment, even though it hasn't been briefed in this case, the equipment was all owned by Miller Farms. And so Mr. Sundberg, in his declaration, clearly stated the cost of the materials or the goods, the asphalt, three times the cost of labor. With regard to the retaining wall that's made out of decorative limestone blocks, those blocks are twice the cost of the labor. Well, the retaining wall and the asphalt parking lot make up the majority, the vast majority of the contract between these parties that was orally agreed upon. The other item was the, or another item that was a significant cost factor, was the curbing. Concrete, or asphalt, I'm sorry, was used to build the curbing. And in that, Mr. Sundberg said it was the goods cost just a little bit more than the labor on building the curbs. And so the essence of this case, the essence of the contract, is that the goods grossly outweighed the labor. Is that to test what it cost? That's, yeah, that's what the cases that I cited, and there's no case in California that says that. Film service involves a material that was just a fraction of the cost of the labor it took to produce it. But there's no California case, and I've wondered, why wouldn't there be a California case on this in the construction arena? And the reason I think that there would be no case is because there's so many other remedies available to contractors that build on property by filing liens. But this property was Indian land set aside by the state of California, which you can't file any type of liens against. And so getting back to the court's question, the cases that I then cite in other jurisdictions clearly show that as the tool to measure whether it's predominantly goods or services. So film services use the language, or maybe the progeny of it, but film services says a contract for furnishing of labor and materials is not a contract for the sale of goods. And it and other cases seem to look to the essence of what the contract is all about. So if you're just bringing asphalt on and providing asphalt, which is laid out as a parking lot, maybe, I don't know whether that's a goods or services, but that's the written contract, correct? Correct. So then you move on to now there's building of a retaining wall. There's actual construction going on. So why doesn't that fit within the labor and materials? I mean, what's labor for if it's not to build something? Understood. And in just about every contract where you're constructing something, you're going to have what we have here is a mixed goods and services contract. The rock was hauled in under the written contract that was signed by the parties. That has nothing to do with the asphalt then that was hauled in also, and the concrete that was hauled in, and the bricks or the concrete blocks that were hauled in also. If I hired you to provide a retaining wall, let's say I just take it out of this and say, I need a retaining wall on my property because I've got water, I've got a hillside and everything. I'm assuming you're going to just use block. This is not a designer wall. It's just a block wall. Is it your contention that that is a sale of goods then? Under the UCC, the UCC clearly says if it's items that are identifiable and movable, i.e. concrete, that is a good. That's a kind of a key movable. If you're contracting for a wall, what you contracted for was not movable. The finished product arguably is not movable. The asphalt parking lot. What you contracted for was the wall. You didn't contract for a certain number of blocks that are movable. Understood. But the balancing test that film service does then is what was the cost of the material? No, wait. Film services balances the costs? Yes. The cost of what the material was, which was to make negatives or to make prints, versus the amount of labor. That's a big part of the factual basis in film service. And so I don't see how the court can separate this. I thought you told me earlier that there was no California case that found that the cost was really the test. No, in construction. Yeah. In construction. Film service is not a construction case. I'm saying in construction there is no California cases on that. And that's why I went out of this district looking for additional cases to shed light on that as instructive. And so I think that in this case that the goods clearly outweigh the services in costs, in expense, and that this should be considered a goods contract and a four-year statute appropriate. Let me ask you this. Did you argue that with respect to the additional asphalt, whether there was an oral modification of the written agreement? There wasn't additional asphalt, if I'm following the court's question right. The written contract was for bringing in river run rock, which was then placed and compacted. And that was compacted. That then kind of forms the foundation of the parking lot. On top of that, then, the gravel is placed. That gravel, or the asphalt, I mean, was then the oral contract, along with a number of other things. And did you argue that that was an oral modification of the underlying? Yes. That was in. Well, no. No. There was the oral modification of the written contract was the additional river run rock that we, that Miller Farms then brought in and was not paid for. And that's addressed in my brief also. And we argued oral modification, but the judge said in the district court, she said that it had been 10,000 cubic yards of river run rock. There was payment for 10,000 cubic yards. Therefore, anything in addition to that of the river run rock was oral. Right. And what I'm trying to understand, there's segmentedness, and I don't have it finally in my mind as I did last night. So now I'm trying to get sorted out. Was there an argument that some portion of the unpaid amount represented something that would be exempt from the statute of frauds because it was an oral modification of the written agreement? Yes. Okay. And that was for what? That was for the river run rock that was brought in in addition to the 10,000 cubic yards. And for which you were not paid. For which we were not. Well, we were paid for a portion of it. A portion of it. But a portion we were not paid for. Okay. If there's no more questions, I'd like to reserve just a few minutes at the end. You have almost eight minutes. Good morning, Your Honors. Good morning. I think the court hit the nail on the head when they focused on film service, which, although it does not deal with a construction contract, the case does state unequivocally that a contract for labor and materials is not a contract for the sale of goods. At most, this contract at issue here, the alleged oral contract, if it was a construction contract, there are several cases cited in our brief, albeit from out of state, but interpreting the UCC, which hold that construction contracts, highway development, things very similar to the alleged oral contract at issue here, is a contract for services, not a contract for goods. I think Judge Hugg made a good point when he commented that the focus may not be on the cost of the project. It's on the contract and what the parties expect from the contract. From the alleged oral contract, the parties here expected a retaining wall, not movable. They expected asphalt paving, the final product, again, not movable. These are not goods contracts. They're service contracts subject to the two-year period in CCP Section 339. As far as the written contract is concerned, the Court made comments as to the oral modification. The only evidence before the Court shows that the one written contract that Mr. Nadergar did enter into was fully paid with a check in the amount of $35,000 and some odd dollars, that is the best evidence of whether or not that March 9, 1998, written contract was fully performed. Were there subsequent deliveries, though, some of which were paid for? I don't believe there's anything in the record showing subsequent deliveries that were paid for, particularly not with it. But you do agree that under California law there can be an oral modification of a written contract? I do agree with that proposition. So then it's just a question of fact and whether there's enough to get a jury trial on it. That's correct. And I submit, Your Honor, that the evidence, the undisputed evidence, the written contract was paid for in full. Okay. That's really all I have, unless the Court has any questions. I don't think so. Judge Gibson, do you have any questions? No questions. Okay. Thank you. Fine. Thank you very much. The case just argued will be submitted. I'm sorry. I'm sorry. You did save time. I'm not trying to rush you. I'm just, you know, short-term memory problems here. Called a senior moment, and I have them, too. I grabbed film service real quick, and the court on page 1306 in film service says, after they had balanced all the evidence of what was actually performed, they said the essence of the contract in film service was to provide a service which resulted incidentally in the transfer of some tangible personal property. Well, in our case, it did not require the transfer of some incidental personal property. The main essence of our contract, the main cost, was the personal property that was brought in, i.e., the asphalt, the concrete, the decorative blocks, the septic tanks, et cetera. And so I believe film service interpreted and read the way that it does, where the personal property was just a small fraction of the cost. The main cost was labor in film service, then read fairly that it is beneficial to our case. Thank you. Could you address the question that I posed to counsel for Miller Farms, which is what is your evidence that there was, in fact, an oral modification? What are you relying upon to show an oral modification? What we're relying upon is the Declaration of Garth Sundberg, which is submitted. It's around page 94 in our brief, not the brief, but the record. And in it, Mr. Sundberg talks about the conversation that he had initially with Mr. Nettegaard, that Mr. Nettegaard and Mr. Sundberg, on behalf of Miller Farms, entered into the written agreement, that Mr. Nettegaard then came back and said, we need more rock for this, we need more rock for that, and they continued hauling, and they hauled, instead of 10,000 cubic yards, they hauled in excess of 20,000 cubic yards to the project. And that was the evidence that we provided. How did Mr. Nettegaard get into this? How did Mr. Nettegaard get in? That's a good question. Maybe a better question is, why did he get into it? But the way he got into it was, he was the contractor over the entire project, and this tribe had no money at all. And so what they do is they go out and they look for a project manager that has the money, that has the clout. Well, Mr. Sundberg, Garth Sundberg, the vice president of Miller Farms, is also Native American, and he's very aware of sovereign immunity and building on tribal properties, and they've been stung before Miller Farms has, and that's why he contracted directly with Mr. Nettegaard. But Mr. Nettegaard was general over the entire project. Thank you. Okay, thank you. The case that's argued will be submitted. Thank you both for arguing. The next case on calendar will be PDM Strokow v. J.A. Jones Construction.  Good morning, Your Honor. Good morning. Paul Waters on behalf of J.A. Jones Construction and Fireman's Fund Insurance Company. I'd like to reserve five minutes for rebuttal. Where I'd like to start is focusing the Court's attention on two key issues. The first is that the only changes at issue in this case are changes which were not initiated by the owner, and we can find that in the excerpt of record in the Court's Memorandum of Opinion at 785-786. So the only thing that were involved in this trial are changes which are not initiated by the owner. Second, I think it's important to understand that we are not appealing the district court's determination of the number of hours that were involved in this particular extra work. What the appeal is based upon are what we contend are errors in the district court's interpretation of the contract regarding how you price those changes which were not initiated by the owner. And we begin with three very basic contract interpretation principles which we all learned in law school, that the contract must be read as a whole and every part interpreted with reference to the whole, that the court must give effect to every term employed by the parties and reject none as surplusage, and third, that the court must interpret the contract in a manner which gives full meaning and effect to all of the contract's Okay, with those principles in mind, can I ask you to test a theory of my reading of the contract, which I think is what's been argued. If you start with the paragraph 8 of the subcontract, which talks about changes, there's a provision in there that says, in a non-owner-initiated situation, that the contractor may order extra changes. And then it says that any adjustment to the price or time for completion of the work shall be made or claimed solely in accordance with the applicable provisions of the contract, otherwise on an agreed or equitable basis. So from that, one would look to applicable provisions of the contract that may apply to the particular change or, if it's not there presumably, otherwise on an agreed or equitable basis. So we take that principle. Looking to whether it's agreed or another provision of the contract, I noted that in Schedule A, where it's talking in subparagraph section I, additive design changes in unit prices, that any changes to the design or magnitude of scope of this project will be analyzed on the basis of cost conditions which are affected by these changes. The following rates will apply, and these are the computed rates in this case, with what amounts to a 15 percent override. So that's provision I. So it talks about cost, and it seems in my reading to define, for purposes of cost, there's an agreed schedule there of rates for the labor rate. And then I turn to Schedule F, which talks about changes, and it says in paragraph 8, second bullet point, it is agreed that should it become necessary for the subcontractor to perform additional work for the contractor or another, in this case, that is not an owner-initiated change, such work shall be performed at cost, plus a percentage of markup not to exceed 15 percent, and so on. So when I go back to Schedule A, paragraph I, I find the word cost, and I'm looking at the defined labor rate, and I'm wondering why that doesn't give meaning to all of the contract and why it doesn't say with respect to these changes, the parties agreed that when you're looking to cost, the labor rate has been agreed to. What's wrong with that reading? Because, Your Honor, and in referring to the excerpt of Record 600, which is Schedule A, section I, it refers to that the scope of the project will be analyzed on the basis of cost conditions which are affected by these changes. It's talking about cost conditions, the conditions under which the work is going to be performed. It then goes on to say that the rates will be applied will be as follows. There's a distinction between these unit price rates, although the section itself is called Additive Design Changes Unit Prices. But it's set forth here are unit price rates. For the cost of labor. Not cost. Well, but why is that? I mean, I'm trying to understand. What is the purpose of that? Isn't it defining that when you're talking about cost, there's an agreed labor rate for these items? I don't believe so, Your Honor. What's the purpose of that section then? The section that is quoted here is talking about when there are owner-initiated changes, that they will be analyzed. This is owner-initiated changes? These are for owner-initiated changes. In other words, you need to read all of the clauses together. I was about to. You began with Paragraph 8 of the form contract, which is Excerpt of Record 589. I think if you then turn to Excerpt of Record 612, which is Schedule F, which is entitled Supplementary Provisions, it states specifically that the following additions, deletions, and modifications to the specified subcontract sections hereby constitute a part of the subcontract agreement. We then turn to Excerpt of Record 614, and as far as Article 8, the Changes Clause of the contract goes, there are five different provisions which supplement Article 8 in the subcontract agreement. The second of those provisions is the one we've just discussed. It is an express provision which deals specifically with changes which are not initiated by the owner, which is all that was before the district court, and it says that the subcontractor would be paid for those on cost plus a percentage of markup basis. It goes on, and there are four other provisions. But it doesn't really define what cost is, does it? It doesn't say actual cost to the subcontractor. It just says shall perform at cost. So then we're left with knowing what cost means. I think cost is cost, Your Honor. It's the amount of money that you pay your labor for performing that work. Earlier in the agreement, as Fisher had said, cost earlier is defined as, you know, $45 an hour, $70, $40. I don't believe that it is. It says rates. If you read the entirety of Section A, it says that the changes are going to be based on the following on the cost conditions which are affected by these changes. It's talking about the nature in which the work is going to be performed. Are you going to perform at night? Are you going to perform it on overtime? Yes, sir. The basis of cost conditions is what it says, isn't it? That is the phrase. Why isn't that cost conditions? Well, cost conditions is not equivalent to actual cost. So if this were owner initiated and there was a cost condition analysis, these rates would apply to it, correct? Absolutely. But because it's non-owner initiated, this paragraph is meaningless or irrelevant? It does not apply to changes which are not owner initiated. There's basically two different pricing mechanisms in the subcontract, which is fairly typical in the construction industry. You have one method for pricing changes which are initiated by the owner, and those are typically based, as here, on unit prices, not cost, but unit prices. That's what these are, which are in Schedule A. And for changes which are not initiated by the owner, those which are initiated by the general contractor, they're based on cost plus a percentage of markup. So what our problem, and where the district court erred in its interpretation, we believe. When you say based on cost, that kind of begs the question of what I was asking earlier, is what's the definition of cost in that context of Schedule F when cost seems to mean, in the earlier schedule, that cost means what those labor rates were? Well, Your Honor, there is a distinction between cost and unit prices. Cost is the amount of money that you expend out of pocket to pay for your labor. A unit price can be anything that the parties negotiate to perform a specific unit of work. They are not synonymous. I understand price and cost are different, but this seems to define, at least for purposes of owner-initiated changes, that an element of cost, which is being defined as for the purpose of figuring the unit price, they're specifying the labor rate. Now, if there's an owner-initiated change, there's going to be materials, right? Right, Your Honor. There's going to be other cost elements that have to be factored in. But for the labor rate of the cost component, there's an agreed rate. For owner-initiated changes, we agree, Your Honor, that these rates set forth in Schedule A would apply. Okay, and it's my understanding that when the invoices for the non-owner-initiated changes were submitted, they used these hourly rates, correct? When the proposals for the non-owner-initiated changes were submitted by the subcontractor, they did use these rates. Okay, and were any of those invoices paid? No. Okay. They were contested immediately upon receipt, and the subcontractor was informed by Jones that they were failing to follow the provisions of Schedule F, which applied to non-owner-initiated changes. And if we can skip ahead and address that point for the sake of continuity, you can look to ---- Before you skip ahead, I'm just curious about one thing. With the context of this litigation in the district court, that Jones initially was contesting payment of anything, any amount for the changes, including costs, the owner and non-owner, the way I was reading it. In other words, the full million dollars plus was being contested on the basis that the five-day thing wasn't complied with? There was an initial argument, which was basically discarded at trial, that there was a ---- that the notice of contemplated change provision, which is a timing provision when a document called notice of contemplated change is issued, if that applied, that in that case, yes, there was a waiver that the subcontractor was borrowed. They would have had to eat the million-plus cost. Pardon me? They would have had to eat that million-plus. If that provision had applied, yes, Your Honor. Which is what you contested. We contested that, among other arguments. But the primary argument has been, was, and always has been, that under Schedule F, we have a specific clause that ---- I'm just really curious how application of that, you were trying to say that you had to pay none of that million dollars plus. Well, there's sort of cascading arguments there, Your Honor. The first argument is if the provision out of ---- If the provision, and if you look at the excerpt of record and you look at the clauses, that's what the clause says, that where a notice of contemplated change is issued, you fail to provide me with your proposal in five days, you've waived your right to it. All right? And I think this really is where the district court became a little bit lost, because what it did is it looked to that provision. It said, I make a determination that I can't find a piece of paper that says a notice of contemplated change. Therefore, that provision doesn't apply. And I'm going to read out all the other clauses in Schedule F. And that is a fundamental flaw of contract interpretation. Judge, could you tell us where you specified that their use of labor rates was inappropriate? Yes. Is there any evidence of that? I will. It begins when, and this is important to understand, it begins when the changes are issued. If you look at, there are, I can give you the dates and the excerpt numbers. There are letters of September 14, November 6 and 19 of 1998. Letters of January 26. Instead of, where do you, just give us the first one. It would be a lot easier to get through this argument if you let us finish our questions. Then you get to talk, okay? Okay. Just go back and tell me where in the record, you know, read the language where you say use of these Schedule A labor rates is inappropriate. There are six. Just give me the one that says it first. I don't need six. Just the, what's the first one, if you have it? If we go to 634, which is the September 14, 1998 letter. The third paragraph, as we're issuing this change, is directing the subcontractor to monitor and record all added cost and advise us accordingly under the guidelines of your subcontract agreement. I'm sorry, but where does it say do not use these, that the rates you're using are inappropriate? Your Honor, this is when the change was issued. I'm just, look, let me see if I can make a clear request here. Maybe you're arguing that it's implicit in your letters. I want to know, are you saying you explicitly said that your use of the Schedule A labor rates is incorrect under the contract? Words to that effect. Your Honor, at this point in time, we hadn't received the subcontractor's proposal. You need to understand the sequence of events. We issue the change. We ask under these various correspondence to provide us with your proposal for the added costs. So that's the inception of it. It's not until we receive the proposals back that we see that they're not using the correct pricing provision in Schedule F. At that point in time, we then advise them that they failed to price it correctly. Okay. That's what I was asking for. Where's that? Go to Excerpt of Record 694. And this is September 9th, 1999. Now, at this point in time, we have just for the first time received the subcontractor's proposal. We see that they're not applying the correct provisions of the subcontract to the pricing for these changes, which are not initiated by the owner. And this is an assistant project manager who states in the second paragraph of this letter that, we hope that you are aware of your contractual obligations under Schedules A and F of your subcontract, which clearly outlines the necessary procedures of processing any and all change orders, requests in the project. Okay. An integral part is the format, enclosed backup, sufficient detail, fair review, et cetera. That refers them to Schedule A and doesn't say they're using the wrong rates, does it? It says A and F. We're telling them this is an assistant project manager directing them to the fact that there is a distinction. And I don't think someone can write it any clearer. There's a distinction between what applies for under Schedule A and what applies under Schedule F. There's subsequent correspondence. So that's your best evidence? No, Your Honor. Your Honor, this issue is not disputed. Sterkow's project manager admitted during the trial that the use of Schedule F was always an issue from the very first time that he submitted his proposal. So I understand that. I'm just trying to understand the interplay between A and F. Since you referred him to A, I'm just trying to understand what the interplay is. You started about with the principles, okay? All right. Principles of contract interpretation are very lovely when they're stated in the abstract. But trying to apply them, I'm trying to give meaning to every word in the contract. Okay? You've now said Schedule A is irrelevant here because that only applies to owner-initiated changes. We should be looking only at Schedule F. Forget A. Even though A talks about changes and F seems to be a modification of it. We're not reading Schedule A out of the contract at all, Your Honor. It has full meaning. It just does not apply to the disputes that are before the district court. Okay. Well, I'm not going to make the argument for your opponent. I'm just trying to understand the contract. All right. And also, and again, I think it's important that the court understands that this issue, the application of Schedule F to these particular changes, contemporaneous with the receipt of these proposals was discussed by Strokel's project manager and Jones's assistant project manager. Strokel's project manager knew that we were insisting upon the application of Schedule F. Well, I'm not arguing that Schedule F is not applicable. In fact, I'm trying to read F and A together and figure out what they mean. Well, I think the way that you read them together is that you have Schedule F. And the way to harmonize everything is that you have two different pricing mechanisms, one pricing mechanism which deals with the issues that were before the district court, changes not initiated by the owner, another for changes which are owner-initiated, and there you use the unit rates. And I think that that is the way to harmonize the entire contract scheme. I'm just curious. Why is that? Why would there be a different basis for costs for owner-initiated and for non-owner-initiated? The project manager for Jones testified at trial that traditionally what owners like to use, they like to use unit rates because then they don't have to go through the exercise of trying to determine what was the cost itself. They'd rather up front agree, even paying a premium on a unit rate, in order to just ease their change order procedures, whereas the general contractor wishes to know, I want to know what your cost is in labor to do the work. And it's a fairly common split. Why wouldn't the same thing be true for a subcontractor? This is a subcontractor. I know it's a subcontractor. But why wouldn't the same thing be true, the same argument that you just make that why the general wants it, why wouldn't that also be true for the subcontractor? Why don't they want it? Why shouldn't a fixed rate of labor be applicable there? They may. I can't. This is the ‑‑ I mean, a use of two different pricing mechanisms is fairly traditional. I really don't think I'm following your question, Your Honor. Why would the subcontractor ‑‑ You just said that in a general contract they want to have the fixed rates because it's easier to figure what the cost is going to be. No, Your Honor. The owners typically like to have unit rate prices. General contractors like to have cost. I'll forget it. Okay. I think you've used your time, so we'll hear from your worthy opponent. Good morning, Your Honor. I'd like to reserve five minutes for rebuttal. You don't get rebuttal.  All right. Your Honor, to pick up on the point that was just being discussed about why this ‑‑ you know, are there different rates? Are all these traditional? I mean, there's all sorts of varieties that contracts can be written in. There's no ‑‑ I don't think it's, you know, a standard situation when you have two tiers of pricing for change orders. That's ‑‑ I don't think that's a traditional way to write contracts at all. And, in fact, if Jones, the change, if you read it the way Jones wanted to read it, in Section 8F, Schedule F, Section 8, they're really exposing themselves to kind of open ended change orders if they read that ‑‑ if the contract is read the way they want it to be read. If changes that are not initiated by the owner, meaning changes that are initiated by Jones, are going to be performed at cost, then you don't have a specific dollar figure in the contract that you can always go back to and say, hey, you agreed to do it for this. Yeah, but their argument is that that's why there's this process for submitting it to them in advance of the work, isn't it? I didn't hear your question. Isn't their answer to that that that's why they have a procedure to submit the proposal in advance? Well, here they never submitted any proposals. There were no ‑‑ No, but that's the construct of the contract, isn't it? It could be read that way. But the ‑‑ Your Honor, I think Judge Fischer, your approach when you were outlining reading the three key provisions is the approach that I think is the appropriate approach to take. Well, is that the approach that you argued below? I think it was. I think it was. That the provision, or actually below we argued that section A.I. applied to all changes. And what the judge, what the district court judge ruled was based upon listening to extrinsic evidence, based upon listening to the testimony of Strokal's witnesses and Jones' witnesses, the judge ruled that between these two clauses, Schedule A.I. and Schedule F, Section 8, between those two clauses, he made a finding of fact that the parties intended that Schedule A.I. applied to all of the changes. So there's a finding of fact based upon extrinsic evidence. Did he really specifically make that finding? I didn't see that. I think it's in the ‑‑ it's in the opinion. He said he found that A.I. applied to all non-owner changes. Let's see. I know that's what he in fact did, but I just wonder if there was a finding. I didn't see it. The court on Excerpt of Record 788, line 18 through 19, which is a portion of the opinion, the judge, after going through the background and the dispute, states the court concludes that the parties intended that these rates, meaning the A.I. rates, apply to any change order work. And if you look at Schedule A.I., it says any changes. That section doesn't say these rates apply to owner-initiated changes or non-owner-initiated changes. It states right there, A.I., that these rates apply to any changes. And if you follow the course of the contract negotiations, at the very beginning of the contract negotiations, Jones asked Strokow to submit unit prices for change order work. Strokow's response was, that cannot be done in our industry. We don't price changes that way. We will price changes based upon the cost conditions which affect us, and we will use the following rates. That's what A.I. is. Jones asked us for certain. What was that reference there that I didn't get your page soon enough? I believe it's excerpt of record 788. It's what should be page 6 of the opinion. Yeah. And it's at line 18 through 19. Yeah. The court concludes that the parties intended that these rates would apply to any change order work. Yeah. Because the court has already gone through the background that there's a dispute over whether Schedule A.I. applies or whether the other schedule applies. So there you've got a factual finding based upon not only the explicit reading of the contract, but also extrinsic evidence, listening to testimony of the witnesses, judging credibility, et cetera. So that finding should be given extreme deference by this Court. He does reference to the first three or four payment requests, which they were all owner-initiated, weren't they? That's what Jones contends, but there's no evidence at the trial court level. There's no proof that they were owner-initiated changes, and we never agreed that they were owner-initiated changes. And if you look at the testimony of Mr. McDowell, which is in Respondent's Excerpts of Record 1 through 6, Mr. McDowell testified that, you know, there was never any discussion that some of the changes were passed through, meaning owner-initiated, and some of them were non-passed through, meaning non-owner-initiated. But that was something that never was discussed during the course of the trial or, excuse me, during the course of the project. That just came up kind of as a litigation posture well into the course of the project or well after the issues arose. And Change Orders 1, 2, 3, and 4 were situations where we had used these proposed labor rates or the agreed labor rates in pricing. Strokow had used these labor rates in pricing their Change Orders. And no one ever, Jones never objected to the use of the labor rate in that context. And also, Your Honor, Judge Fischer, you were asking some questions about Jones's letters that object to the use of labor rates by Strokow. And if you look at those documents that were cited, Excerpt of Record 634 and Excerpt of Record 694, nowhere in those letters is Jones saying we object to the manner in which you're pricing your Change Orders. Well, I looked ahead, and there is in the January 19th letter, which is ER 709, and you look at there, I just want to make sure I understand this, if you look in the detailed papers that are, I think, attached to this letter, make sure I understand this, get to ER 721, paragraph 26, for example, shop labor, field labor to be estimated with final reconciliation. Now, am I reading that correctly, that that is Jones's response to a PDM submission or a summary? Your Honor, I believe you're correct. It's a response to Change Order 10. But what you're talking about here is they're going through the way that we've prepared the summary. Yes. Nowhere in here, I don't think, do they say you can't use the labor rates because you have to give us actual costs. That was never a discussion that came up during the course of the project, and it's not shown in the record anywhere. And additionally, this was also addressed by the district court judge, where he determined that the contract does not require StroCal to submit its actual cost records. And in fact, in the structural steel industry, structural steel subcontractors do not keep what Jones would consider kind of, you know, the actual cost records. You don't keep a time card showing the man used 20 minutes to pick up one piece of steel and 20 minutes to pick up another piece of steel. You just can't do it that way. What StroCal does is come up with these labor rates, 45, 70, and 48 an hour, which is based upon their experience, based upon their evaluation of their business, and they use those labor rates. And that's the way it's done in this industry. The judge specifically made reference to that in his opinion after listening to expert testimony that StroCal provided. Was there something else they said other than what you just referenced earlier, that the judge was considering what was done in the industry and that sort of thing? Well, other than that, no, that's what the judge was focusing on, I think, that in the structural steel subcontracting industry, you don't track your changes by trying to track the actual costs. But he didn't say that anywhere. He says it in the opinion. Where? I think it's 789. Is that true? 789. Okay. It's in page 10 where the judge writes, it was StroCal's practice to have its estimators assign hours involved in fabricating and erection, and then this procedure is in accordance with the ongoing practice in the steel fabrication and erection business, as established by the witnesses Stro, McDowell, Schwartz, and to some extent by Jones's own construction manager, Contrardi. That's on 792 of the record, I see. And, you know, the judge goes on to note that it's not the practice in the industry to keep a specific time log. So you really can't produce the kind of actual cost records Jones would demand StroCal to produce. That's not the practice in the industry. And nowhere in the contract does it say, when you're pricing change orders, you must produce to me your actual cost records, including, you know, time tickets showing the minutes and hours that a particular employee worked on a matter. How does that fit, then, with the Schedule F, paragraph 8, where it says, such work shall be performed at cost plus percentage? Well, one way to read it is to read it the way Judge Fischer read it. The word cost can mean a variety of things. It can mean actual costs. It can mean an estimated cost. It can mean an agreed price. For example, if you're pricing a scope of a change order, the traditional way to do it would be for the contractor to say to the subcontractor, I want you to change these 15 beams on the fifth floor. Give me a firm price to do it. That's the traditional way to do it. That's not actual costs. It's an estimated cost that becomes the price for the scope of the work. So cost certainly can mean the labor rate cost in AI. Another way to read Schedule F, section 8, to make it consistent and not read it out of the contract, is to understand what it's really directed to. It's really not directed to change order work at all. It's directed to additional work. And on a construction project, you have all sorts of tasks that come up. For example, Strocal is a structural steel erector. They're going to be the only one on the job with a crane. So other contractors might need the crane to hoist their materials to the roof or the fifth floor, et cetera. Usually, it's part of the contract that someone like Strocal has to let these other subcontractors use their crane on a certain scheduled time period. What this is really directed to, in my view, is that kind of additional work. It's not an owner change. It's really not a change at all. It's when Jones comes to the contractor and says, okay, the guy with the mechanical equipment needs your crane to hoist it up to the roof. And for that kind of work, they just want it to be done at a basic cost. They don't want too much markup in there, and they don't want Strocal to be able to say, well, I'll do it for $200 an hour. They want to be in a position to say, well, you've got to cooperate with this guy and just do it at cost plus a markup. That's the way you should really read that clause. So AI applies to what are you saying, just these kind of add-ons but not a change order? AI applies to all of the changes. All of the changes. The colloquy I would just insert is schedule F, section 8, bullet point 2. Got it. That's what I was explaining. It would be easier if both of them weren't 8. That's true, Your Honor. That's true. This probably wasn't the clearest contract ever written. But if that's the truth, if that's what they meant, they put change as opposed to add. No, they said additional work. It says that is not an owner-initiated change. Right. You see, it's agreed that it should become necessary for a sub to perform additional work. And if that additional work isn't something that the owner told you to do. No, that is not an owner-initiated change. Right. Because if the owner changes something, then that would be an owner change. But if the contractors have these kind of you scratch my back, I'll scratch yours situations come up, that's what this is directed to. Mr. Jones wants to be able to have a provision such that they can have the contractors do some additional work to help another contractor out but not kind of hold the other contractor blackmailed by asking for an exorbitant price. How does that protect them? I don't understand. They have to do it at their cost. So you would read cost in F under that as not incorporating the rate structure of AI? Well, because here it depends on who the other subcontractor is. I mean, it depends on what the other situation is. Okay. I wanted to get to a couple of other points. The quantum merit issue. The brief, Jones's brief made an argument that a quantum merit recovery must be based upon actual costs. I don't think that's the law at all. And furthermore, the contract here, the recovery here is a recovery based upon the breach of contract action. When the judge uses the quantum merit language in his opinion, he's using that just kind of in the sense of incorporating the phrase other agreed equitable basis. Then he kind of incorporates the quantum merit logic. The opinion is not a quantum merit recovery. It's a contract-based recovery. But even if it was a quantum merit recovery, quantum merit is the reasonable value of the work. It's not the actual cost of the work. Jones tried to argue that it's the actual cost of the work. The two cases they cited don't stand for that proposition at all. I mean, if you just look quantum merit up in Black's Law Dictionary, it will say the definition is the reasonable value. Here the reasonable value is, you know, the actual, you know, how much strokeal is really going to be affected by the cost impacts, which is set forth in their labor rates. And I have nothing further, Your Honor. Okay. Thank you. I'll give you a full minute. You're down to 35 seconds, but you have a minute to. Is that the entirety of my time, Your Honor? That's the entirety. I have heard five or six different interpretations of this contract, which were never advanced at trial here today during this argument. The court did not address Schedule F. The strokeal, and they contended that Schedule F did not apply to anything. I say you need to harmonize and read them both. There are principles for both of them. Quantum merit is when there is no meeting of the minds. If there is no meeting of the minds, which from this discussion today appears that maybe there is an ambiguity, then you apply quantum merit, which is based upon the cost of the work, cost of labor and material. That's what Central Steel says. That's what Seaboard Surety says. If that's the case, if we were in that mode, would have been the court incorrect in looking to A1 labor rates then? Absolutely. Because? Because if you look at Macri, look at your own decision. What Macri says is when there is no meeting of the minds, you don't apply unit prices that are contained in the contract. No, no, no. He's looking to it as a guide. As he said, it's very difficult to go extrapolate out. They don't keep their rates that way. The distinction is records of time expended. That's what we talked to. That's what you talked about earlier at page 791 and 792, records of time expended. The Court said, no, I'm going to find that you don't have to keep timesheets. That has nothing to do with the mechanism for pricing. My question was, let me see if I can. Certainly. Maybe you think you're answering it. I'm not understanding it. If the court says, look, they don't keep their records so we can reconstruct an at-cost rate, and I looked at the contract, and at least for some purposes they agreed the labor rate would be these set rates. Therefore, as a matter of quantum merit, I'm going to use that as guidance. I can adopt it as a contract matter. Would that be impermissible under quantum merit principles? I believe so, Your Honor, because if you're going to use a rate contained in a contract, then there must be some meaning of the mines. And it's inconsistent with quantum merit. You just said the predicate of your argument was now you think maybe there wasn't a meeting of the mines, therefore it was ambiguous, therefore one has to go to quantum merit. Going to quantum merit, I'm assuming now, there has been no meaning of meeting of the mines. The court then says, look, I've got to fix a rate here. I look at the evidence. The plaintiff is telling me they don't keep their records that way. I find that credible. I don't have any how am I going to fix a rate. I look to the contract and I say, well, for some purposes, not binding here, they fixed this labor rate, so I will use those labor rates. Is that impermissible under the principles of quantum merit? I believe that for the court to say that in terms of determining the number of hours expended, it can come up with its own calculation. And we don't challenge that. But for the purposes of what was the labor paid to that steelworker, that is what quantum merit requires. So then they have to prove what they actually paid to the steelworker. Which is very simple. And the court did not determine that that was unavailable to them. All right. Only timesheets. Thank you. Go ahead. Sure. At trial, was it argued on behalf of Jones rather strenuous, I would imagine, that Schedule IV, is that the one? Yes. Yeah. No. Schedule F, Schedule F, paragraph 8, was it argued that F8 applied and that's what should the court should be determining it on? Yes, Your Honor. That the specific, the second bullet point under Schedule F, Article 8, was the provision applicable to what was that issue, which were non-owner-initiated changes. Yeah. Well, what I'm asking is if that was argued. It was. I would imagine strenuously. So the judge decided the other way. I mean, he was actually contemplating that, whereas it kind of indicated in the briefs that he just ignored it and overlooked it or something. But I gather it was being argued. And he found that was not the intention of the parties, that that, that a different rate than A1 would apply. It appears in his opinion that he basically threw the baby out in the bathwater. He looked to the third bullet, having come to a conclusion, I can cite to you the record, where the third bullet didn't apply. And the Court discusses this at Excerpt of Record 787. What the Court did is discuss this third bullet and said, I don't find that the provision of notice of contemplated changes, which would create a waiver situation, as we discussed earlier, I don't think that applies. And there a complete waiver. The whole million three would be lost, right? Exactly. And the Court said, I don't believe that that third term under Schedule F, Article 8, applies, and then disregarded all the balance of the terms, the supplemental provisions under the changes clause. You can't find anywhere in his opinion. Yes, but you argued it. Did you not? We argued two different things. We argued three different things, Your Honor. First, we said the first line of defense was if the notice of contemplated change provision applies, they're not entitled to anything. The Court disagreed with this. Fine. We're not appealing that. We argued, secondly, that where we have non-owner-initiated changes, which is all that's being litigated, the second bullet in Schedule F applies. But you would have to assume that the judge either completely overlooked it, even though you strenuously argued it, in finding the intent was to use A-1. Well, I think if you look at the opinion, what the Court did, two things. They discussed the third bullet, nowhere do they discuss the second term, and then they try to buttress that conclusion with looking at the conduct of the parties. And that's the other ground for appeal, which is what Macri says is when you look at the conduct of the parties, you look at the conduct of the parties regarding the extra work at issue. And what this Court did, instead of looking at the conduct of the parties regarding this extra work, where we have letters that say give us your added costs, when we get the contract provisions, we have Mr. McDowell, Stroke House project manager, admitting, yes, as soon as we submitted these proposals, we were told Schedule F applies, and that's the dispute, and that's why we're here today, two years later. He didn't look at that conduct. Instead, he looked at conduct of three negotiated changes which didn't apply and which were owner-initiated changes. And what Macri says clearly is when you have to look at conduct because you don't believe that the language of the contract is clear, look at the conduct relating to the extras at issue. And that was our second point. And then the third was quantum merit. If you can't get it, I appreciate all your time. We've had a New York minute this week, a California minute. We'll call this a Nevada minute. Thank you. Even though you're from Washington. Okay. Any questions, Judge Gibson? No, I just wanted to comment that this was an excellent argument. Good. And, Judge Hugg, did you want to go more? All right, fine. Thank you. Thank you all. Counsel, well argued. Appreciate it. And this case is submitted and we will be in recess.
judges: Hug, Gibson, Fisher